UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:10-cv-647-RJC-DCK

| | |
|---|---|
| TEC REP SERVICES, INC., | ) |
| Plaintiff, | ) |
| v. | ) ORDER |
| DEARBORN TOOL & MANUFACTURING, INC., | ) |
| Defendant. | ) |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment on Plaintiff's Amended Complaint and on Defendant's Counterclaim, (Doc. No. 19), and the related briefs and filings.

I. BACKGROUND

Dearborn Tool & Manufacturing, Inc. ("Dearborn" or "Defendant") designs, manufactures and supplies machined parts to customers. (Doc. No. 20 at 1). Tec Rep Services, Inc. ("Tec Rep" or "Plaintiff") is a manufacturer's representative agency that serves companies such as Dearborn by handling their sales, marketing and engineering. (Id.). Tec Rep represented Dearborn from April 2005 through January 31, 2010 on five different accounts – Borg Warner Turbo Systems ("Borg Warner"), Holset Engineering, Alemite, Parata and Detroit Diesel Remanufacturing West ("Detroit Diesel"). The only two accounts at issue here are the Borg Warner and Detroit Diesel accounts.[1]

---

[1] The parties agree that no amounts are due with respect to the Holset Engineering, Alemite and Parata accounts and the total amount of commissions which remain unpaid on the Borg Warner and Detroit Diesel accounts through January 31, 2010 is $28,399.45. See (Doc. Nos. 18 at 1; 20 at 10). While Dearborn has not yet paid this amount, it does agree that it is

A Tec Rep program manager named Russell Golden ("Golden"), who previously worked for Borg Warner, was the main reason Dearborn hired Tec Rep to represent it on the Borg Warner account. (Doc. No. 20 at 2). When Golden stopped working for Tec Rep on January 31, 2010, the parties ceased doing business.

At issue here is whether Dearborn owes Tec Rep commissions for parts sold after January 31, 2010. Tec Rep stipulates that "[t]he sole amounts claimed by Tec Rep from Dearborn are commissions on sales of products, programs and/or parts to Borg Warner Turbo Systems and Detroit Diesel Remanufacturing West between February 1, 2010 and January 31, 2012 that were for business contracted for prior to February 1, 2010." (Doc. No. 18 at 1). Dearborn contends that it owes no further amounts to Tec Rep after January 31, 2010, "the date Tec Rep ceased performing services for Dearborn and selling Dearborn's parts to its customers, on any account." (Doc. No. 19 at 2).

A. Borg Warner

The provisions at issue in the April 2005 agreement between Tec Rep and Dearborn regarding sales to Borg Warner (the "Borg Warner Agreement") are as follows:

> [Commissions Clause:] Commission is to be payable at the rate of 5 (five) percent on all products, programs and parts sold by Tec Rep Services for Dearborn Tool at this account.
>
> [Automatic Termination Clause:] This agreement will automatically be terminated at the time that Russell Golden is no longer an employee or in any other way associated with Tec Rep Services without the requirement of a 90 day written notice. However, Tec Rep Services and Dearborn Tool & Mfg. may elect through an additional agreement to continue representation.
>
> [Purchase Orders Clause:] Purchase orders which are in effect at the time the termination becomes effective and purchase orders received thereafter for the

---

owed.

> same product, program or parts will be payable to Tec Rep Services as set forth in Commissions paragraph of this agreement.
>
> [Two Year Clause:] It is further understood by both parties that in the event of termination of this agreement by either party, Tec Rep Services will be paid full commission on all orders from, or deliveries to, BorgWarner Turbo Systems which are substantially attributable in whole or in part to activities or services performed prior to the effective date of termination, regardless of the shipment and invoice date, <u>for a period of 2 years (730 days) following the date of termination</u>.

(Doc. No. 26-3 at 3-4) (emphasis added). Significantly, Tec Rep's "form" contract contains language that mirrors the Two Year Clause, except that in the form contract, the underlined language reads instead: "for the life of the program and life of the part." (Doc. No. 20-5 at 3).

Tec Rep points to the above contract provisions in support of its argument that it is owed commissions on parts sold from February 1, 2010 through January 31, 2012 for the Borg Warner account. According to Tec Rep,[2] Dearborn expressed concern that if Golden left Tec Rep, Tec Rep would not be able to effectively service the Borg Warner account. Accordingly, the parties orally negotiated a reduction of the "life of the part" language to include only a two year period. (Doc. Nos. 23 at 4-5; 26 at 1-2). After the parties entered into this oral agreement, Tec Rep sent Dearborn a modified draft contract containing the above Two Year Clause. (Id.). Dearborn did not think the Two Year Clause sufficiently covered its concern regarding Golden's potential departure, and added the Automatic Termination Clause to address this. (Doc. No. 26 at 1-2). The final and executed Borg Warner Agreement contained both the Two Year Clause and the Automatic Termination Clause, each negotiated for by Dearborn. Dearborn interprets these provisions as only requiring payment for orders placed on or before January 31, 2010, the date

---

[2] When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

Golden left Tec Rep.

      B.     <u>Detroit Diesel</u>

While there was no signed agreement regarding the Detroit Diesel account, Dearborn admits that there was an agreement that Dearborn would pay Tec Rep commissions while it provided services and sold parts to Detroit Diesel for Dearborn. (Doc. No. 26 at 6). The parties began working together on the Detroit Diesel account in early 2006, but Tec Rep did not realize that they had failed to execute a written agreement with regard to that account until April 2007. Thus, in April 2007, Tec Rep emailed Dearborn regarding the terms of a Detroit Diesel agreement, (Doc. No. 20-8 at 2-3), and attached a draft of the same, (<u>Id.</u> at 4-6). The draft contained a Commissions Clause, Purchase Orders Clause and Two Year Clause substantially the same as those in the Borg Warner Agreement. <u>See</u> (<u>Id.</u> at 5). It did not, however, contain an Automatic Termination Clause. <u>See</u> (<u>Id.</u>).

Dearborn contends that the parties had no agreement regarding commissions earned after January 31, 2010, when Tec Rep ceased selling Dearborn's parts to Detroit Diesel. Tec Rep disagrees, arguing that the parties' actions created an implied-in-fact agreement that obliged Dearborn to pay commissions on any parts sold from February 1, 2010 through January 31, 2012 for the Detroit Diesel account.

      C.     <u>Counterclaim for Declaratory Judgment</u>

Dearborn also seeks summary judgment on its counterclaim for declaratory judgment. Dearborn seeks a declaration from the Court stating, among other things, that Dearborn has no obligations to pay commissions to Tec Rep on orders from or deliveries to Borg Warner or Detroit Diesel after January 31, 2010. (Doc. No. 16 at 9).

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (1986); accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. ANALYSIS

Tec Rep and Dearborn agree that the total amount of commissions which remain unpaid on the Borg Warner and Detroit Diesel accounts through January 31, 2010 is $28,399.45. See

(Doc. Nos. 18 at 1; 20 at 10). Dearborn believes that this figure constitutes the total amount of commissions it owes to Tec Rep and seeks declaratory judgment to this effect. (Doc. No. 16 at 9). Tec Rep argues that Dearborn must also pay Tec Rep commissions on sales of products, programs and/or parts to Borg Warner and Detroit Diesel between February 1, 2010 and January 31, 2012 that were a product of Tec Rep's efforts prior to February 1, 2010. (Doc. No. 23 at 1).

A. The Borg Warner Agreement

Dearborn and Tec Rep dispute the interpretation of the Borg Warner Agreement. The parties seem to agree that the Borg Warner Agreement terminated on January 31, 2010 when Russell Golden ceased working for Tec Rep. See (Doc. Nos. 20 at 13; 23 at 1-3). The parties dispute whether the Two Year Clause obligates Dearborn to pay two years of post-termination commissions to Tec Rep where, as here, the contract was "automatically" terminated, rather than terminated "by either party." (Doc. No. 20 at 13).

1. The Automatic Termination Clause

Dearborn points to the Automatic Termination Clause in the Borg Warner Agreement as evidence that Dearborn was not required to pay two years of commissions on the Borg Warner account after termination of the Borg Warner Agreement. (Doc. No. 26 at 2). The Automatic Termination Clause that the parties consented to and included in the final version of the Borg Warner Agreement states:

> This agreement will automatically be terminated at the time that Russell Golden is no longer an employee or in any other way associated with Tec Rep Services without the requirement of a 90 day written notice. However, Tec Rep Services and Dearborn Tool & Mfg. may elect through an additional agreement to continue representation.

(Doc. No. 26-3 at 4). The Court finds, and the parties agree, see (Doc. Nos. 23 at 2; 26 at 4), that the Borg Warner Agreement is unambiguous. For this reason, the Court cannot look beyond

6

the four corners of the contract to interpret it.  Lynn v. Lynn, 689 S.E.2d 198, 205 (N.C. Ct. App. 2010).  The Court disagrees with Dearborn's argument that the Automatic Termination Clause indicates that Dearborn is not required to pay post-termination commissions to Tec Rep on the Borg Warner account.  See (Doc. No. 26 at 2).  The plain language of the provision provides nothing more than evidence that the contract would terminate should Russell Golden cease working for Tec Rep.

        2.       The Two-Year Clause

Tec Rep contends that pursuant to the plain language of the Two Year Clause, Dearborn is obligated to pay Tec Rep commissions for two years after the January 31, 2010 termination of the Borg Warner Agreement.  Dearborn argues that the Two-Year Clause is inapplicable where, as here, the Borg Warner Agreement automatically terminated when Golden ceased working for Tec Rep.  (Doc. No. 20 at 13).  The Two-Year Clause states:

> It is further understood by both parties that in the event of termination of this agreement by either party, Tec Rep Services will be paid full commission on all orders from, or deliveries to, BorgWarner Turbo Systems which are substantially attributable in whole or in part to activities or services performed prior to the effective date of termination, regardless of the shipment and invoice date, for a period of 2 years (730 days) following the date of termination.

(Doc. No. 23-1 at 2).

Dearborn's argument is that when the Automatic Termination Clause and the Two Year Clause are read together, it becomes clear that the parties intended to exclude post-termination commissions in the event the contract terminated automatically upon Golden's departure from Tec Rep.  (Doc. No. 20 at 14-15).  Dearborn contends that the Borg Warner Agreement provides two distinct methods of termination: 1) termination by either party, or 2) automatic termination.  (Id.).  Whereas the Two Year Clause provides that Tec Rep will receive certain post-termination

7

commissions if the contract terminates "by either party," the Automatic Termination Clause, which states that the contract will automatically terminate if Russell Golden ceases working for Tec Rep, is silent on this issue. (Id.). Dearborn argues that this indicates that the parties did not agree to the payment of post-termination commissions in this instance. (Id.).

"'It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument.'" Lynn, 689 S.E.2d at 205 (quoting Carolina Power & Light Co. v. Bowman, 51 S.E.2d 191, 199 (N.C. 1949)). "When the language of a contract is clear and unambiguous, construction of the contract is a matter for the court." Self-Help Ventures Fund v. Custom Finish, LLC, 682 S.E. 2d 746, 749 (N.C. Ct. App. 2009) (citing Hagler v. Hagler, 354 S.E.2d 228, 234 (N.C. 1987). "It is a well-settled principle of legal construction that '[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean.'" Lynn, 689 S.E.2d at 205 (quoting Hartford Acc. & Indem. Co. v. Hood, 40 S.E.2d 198, 201 (N.C. 1946)). Extrinsic evidence may only be consulted when the plain language of the contract is ambiguous. Id. "Whether or not the language of a contract is ambiguous . . . is a question for the court to determine." Piedmont Bank & Trust Co. v. Stevenson, 339 S.E.2d 49, 52, aff'd per curiam, 344 S.E.2d 788 (N.C. 1986). In making this determination, "words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible...." Id. "[W]here the language presents a question of doubtful meaning and the parties to a contract have, practically or otherwise, interpreted the contract, the courts will ordinarily adopt the construction the parties

8

have given the contract ante litem motam.[3]"  Davison v. Duke Univ., 194 S.E.2d 761, 784 (N.C. 1973).  The court must not, however, "under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein."  Woods v. Nationwide Mut. Ins. Co., 246 S.E.2d 773, 777 (N.C. 1978).

Applying these principals to the Borg Warner Agreement, it appears to the Court that Dearborn is obligated to pay certain post-termination commissions as a matter of law.  It is evident from a plain reading of the contract that Tec Rep is entitled to receive commissions which are substantially attributable to services it performed prior to January 31, 2010 for a period of two years after the January 31, 2010 termination date.  However, there is a genuine issue of material fact as to the amount of those commissions.  It remains to be seen which commissions at issue were "substantially attributable in whole or in part to activities or services performed prior to the effective date of termination."  (Doc. No. 23-1 at 2).

Dearborn argues that if the post-termination obligation applies to any termination, regardless of how the termination was effectuated, the words "by either party" would become "meaningless, superfluous, unnecessary and without effect."  (Doc. No. 20 at 15).  The Court disagrees.  Reading the contract as a whole, the Borg Warner Agreement contemplates two methods of termination - "by either party" or "automatically" upon Golden's departure.  The "automatic" termination provision appears to the Court only to infer that if Golden ceased working for Tec Rep, termination would not need to be effectuated by either party - it would occur automatically.  To adopt Dearborn's strained reading of the contract language would be to

---

[3] Ante litem motam: before suit brought; before controversy instituted.  Black's Law Dictionary (2d ed. 1910), available at: http://blackslawdictionary.org/ante-litem-motam/ (last visited on December 15, 2011).

9

ignore the entire Two Year Clause. As Dearborn notes, it is well-settled under North Carolina law that in construing a contract, "all parts of the writing and every word in it will, if possible, be given effect." Robbins v. C.W. Myers Trading Post, Inc., 117 S.E.2d 438, 440-41 (N.C. 1960); see also Williams v. Nationwide Mut. Ins. Co., 152 S.E.2d 102, 107 (N.C. 1967) (every clause and word in contract must be given effect if possible).

Dearborn also makes the following argument in a footnote:

> [The Two Year Clause] apparently anticipates a situation in which Borg Warner sent a purchase order to Dearborn prior to the termination of the Contract, but Dearborn did not receive the purchase order until after the termination. This provision would therefore ensure that Tec Rep got paid for work it actually did prior to the termination where the purchase orders did not arrive until after the termination (e.g. if Borg Warner sent a purchase order on Friday, January 29, 2010, the last business day the Borg Warner Contract was in effect, but Dearborn did not receive the purchase order until Monday, February 1, 2010 or later). Tec Rep has not identified any such purchase orders.

(Doc. No. 26 at 5 n.3). The Court finds this interpretation of the plain language of the contract unconvincing. Under North Carolina law, "'where the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty, it is presumed the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing.'" Huttenstine v. Mast, 537 F. Supp. 2d 795, 802 (E.D.N.C. 2008) (quoting Neal v. Marrone, 79 S.E.2d 239, 242 (N.C. 1953)).

Dearborn argues that "Tec Rep has not identified any ambiguity in the Borg Warner Contract" and cannot, therefore, introduce any parol evidence. (Doc. No. 26 at 4) (citing Drake v. Hance, 673 S.E.2d 411, 413 (N.C. Ct. App. 2009) (noting that parol evidence may be used to explain an ambiguous contract term). Indeed, Tec Rep has not argued ambiguity because the provision is clear. The Borg Warner Agreement states that Tec Rep will be paid full commission on all Borg Warner orders which are substantially attributable to activities or services performed

10

prior to the effective date of termination, regardless of the shipment and invoice date, for a period of 2 years following the date of termination.  (Doc. No. 23-1 at 2).

Dearborn also argues that the Two-Year Clause in the Borg Warner Agreement does not obligate Dearborn to compensate Tec Rep for post-termination sales because of the presence of the Commissions Clause in the same agreement.  The Borg Warner Agreement provides that purchase orders are payable "as set forth in Commissions paragraph of this agreement."  (Doc. No. 26 at 5).  The Commissions paragraph states: "Commission is to be payable at the rate of 5 (five) percent on all products, programs and parts sold by Tec Rep Services for Dearborn Tool at this account."  (Doc. No. 26-1 at 1).  Dearborn concludes that the Two Year Clause is limited to only requiring "payment for purchase orders for products, programs and parts 'sold by Tec Rep Services' after termination" and states that it is "therefore inapplicable here because Tec Rep did not sell parts for Dearborn after the Borg Warner Contract was terminated."  (Doc. No. 26 at 5).  The Court does not agree with this interpretation and finds that the plain language of the contract obligates Dearborn to pay certain post-termination commissions.  However, there is a genuine issue of material fact as to the amount of those commissions.  For these reasons, summary judgment is **DENIED** with regard to the Borg Warner Agreement.

B.    The Detroit Diesel Agreement

Dearborn contends that the parties had no agreement regarding commissions earned after January 31, 2010, when Tec Rep ceased selling Dearborn's parts to Detroit Diesel.  Tec Rep disagrees, arguing that the parties' implied-in-fact agreement indicates that it is owed commissions on parts sold from February 1, 2010 through January 31, 2012 for the Detroit Diesel account that were a product of Tec Rep's efforts prior to February 1, 2010.

A contract implied-in-fact arises where the intent of the parties is not expressed but an

agreement in fact, creating an obligation, is implied or presumed from their acts. Creech v. Melnik, 495 S.E.2d 907 (N.C. 1998). It is essential to the formation of any contract, including an implied-in-fact contract, that there be mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds. Id. To establish mutual assent one looks not to some express agreement but to the actions of the parties showing an implied offer and acceptance. Id. Such an implied contract is as valid and enforceable as an express contract. Snyder v. Freeman, 266 S.E.2d 593, 602 (N.C. 1980). Except for the method of proving the fact of mutual assent, there is no difference in the legal effect of express contracts and contracts implied-in-fact. Id. "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." Id.

Dearborn admits that there was an agreement that it would pay commissions while Tec Rep provided services and sold parts for Dearborn. (Doc. No. 26 at 6). Dearborn argues that "Tec Rep has failed to identify any evidence, however, that could establish an implied-in-fact contractual obligation requiring Dearborn to pay commissions for two years after Tec Rep stopped providing services and selling parts for Dearborn at the Detroit Diesel Account." (Id.).

Dearborn attached April 2007 emails exchanged between Dearborn and Tec Rep regarding the terms of a draft Detroit Diesel agreement, (Doc. No. 20-8 at 2-3), and a copy of the same, (Id. at 4-6), as exhibits to its summary judgment brief. These documents provide some evidence of a potential implied-in-fact agreement. On April 23, 2007, Tec Rep wrote: "In speaking with Russell [Golden], I realized that we do not have contracts with you for Alemite and Detroit Diesel. To correct that, I have [attached] our standard contract for each of these programs." (Doc. No. 20-8 at 3). The draft contract contained a Two Year Clause substantially the same as that found in the Borg Warner Agreement, but did not contain an Automatic

Termination Clause. See (Doc. No. 20-8 at 3-4). Dearborn responded: "I want to discuss the cancellation term (2 years) on Detroit Diesel. I do not believe you would be able to service this account without Russell [Golden]." (Id. at 2). Tec Rep answered:

> The cancellation term of Detroit Diesel is the same as the one we agreed upon for Borg Warner. . . . As for new parts, this contract only covers the parts that we had a substantial input into getting the business. If Russell left and you cancelled us, any new parts would not be covered by this contract. I will be happy to discuss this in more detail if you do not agree with this explanation.

(Id.). Dearborn did not respond. (Doc. No. 20 at 6).

A reasonable jury could find that the parties agreed to an implied-in-fact Detroit Diesel agreement. There is a genuine issue of material fact, however, as to the terms of that contract. Specifically, there is an issue of fact regarding whether the Two Year Clause is a term of the implied-in-fact contract. Therefore, the Court **DENIES** Dearborn's motion for summary judgment with regard to the Detroit Diesel agreement.

### C. Dearborn's Counterclaim for Declaratory Judgment

Dearborn also seeks summary judgment on its counterclaim for declaratory judgment. Specifically, Dearborn seeks a declaration that:

> a. The Contract was automatically terminated effective February 1, 2010;
> b. Because the Contract was automatically terminated, Dearborn has no obligations to pay commissions to Tec Rep on orders from or deliveries to Borg Warner Turbo Systems or its vendors after January 31, 2010; and
> c. Dearborn has no other obligations under the Contract after January 31, 2010.

(Doc. No. 16 at 9). Dearborn also prays for a declaration that:

> adjudicates the parties' obligations to each other with respect to the Detroit Diesel account, specifically, a declaration that Dearborn does not owe any commissions or other obligations to Tec Rep for parts sold by Dearborn to Detroit Diesel and its vendors after January 31, 2010, when Tec Rep ceased providing services for and selling parts for Dearborn at this account.

(Id.). The Court finds that the Borg Warner Agreement automatically terminated when Russell

13

Case 3:10-cv-00647-RJC -DCK   Document 36   Filed 01/20/12   Page 13 of 15

Golden ceased working for Tec Rep on January 31, 2010. Therefore, Dearborn's motion for summary judgment on its counterclaim for declaratory judgment is **GRANTED** with respect to subsection (a) ("The Contract was automatically terminated effective February 1, 2010"). The Court finds that Dearborn is obligated to pay Tec Rep for certain post-termination commissions on the Borg Warner account. There is a genuine issue of material fact as to the amount of those commissions. There is also a genuine issue of material fact regarding Dearborn's obligation to pay post-termination commissions under the implied-in-fact Detroit Diesel agreement. Therefore, the Court **DENIES** the remainder of Dearborn's motion for summary judgment on its counterclaim for declaratory judgment.

**IV.    CONCLUSION**

Viewing the evidence in the light most favorable to Tec Rep as the nonmoving party, the Court finds that:

1. The Borg Warner Agreement was automatically terminated effective February 1, 2010;
2. Dearborn is obligated to pay Tec Rep for certain post-termination commissions on the Borg Warner account. There is a genuine issue of material fact as to the amount of those commissions; and
3. There is a genuine issue of material fact regarding Dearborn's obligation to pay post-termination commissions under the implied-in-fact Detroit Diesel agreement.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Amended Complaint and on Defendant's Counterclaim, (Doc. No. 19), is **GRANTED in part and DENIED in part**.

Signed: January 20, 2012

Robert J. Conrad, Jr.
Chief United States District Judge

15